## HENRY DALTON, APPELLANT, *v.* THE UNITED STATES.

Where the objection to a grant of land in California was, that the grantee was a foreigner, and therefore not entitled to hold land, this court is of the opinion that the testimony of conversations of admissions, relied upon to prove that fact, ought not to be received to outweigh the *prima facie* (if not conclusive) presumptions arising from the expediente and definitive title.

THIS was an appeal from the District Court of the United States for the southern district of California.

The title of Dalton to the land which he claimed is set forth in the opinion of the court.

The board of commissioners confirmed the title, but the District Court reversed the decree, apparently upon the ground stated in the following exception:

Upon the trial of this cause, the United States district attorney offered to prove, by Daniel Sexton and J. S. Mallard, witnesses called on the part of the United States, that Henry Dalton, the appellee in this case, was not, at the time of the grant of the land to him in this case, a citizen of Mexico, but was an alien and a subject of Great Britain, which proof was objected to by J. R. Scott, counsel for appellee; but his honor the judge overruled the objection, and permitted the evidence to be given; to which the appellee, by his counsel, excepted, and prays the court to sign this his bill of exceptions, and make the same part of the record in the case, which is accordingly done.

The evidence of these two persons upon this subject was as follows:

Daniel Sexton sworn, and says:

1. *Question.* What is your name, age, place of residence, and occupation?

*Answer.* My name is Daniel Sexton; my age, about 37; I reside in San Gabriel; I am a farmer.

2. *Q.* How long have you lived in California?

*A.* I have lived in this part of California, county of Los Angeles, since the fall of 1841.

3. *Q.* Do you know or not Henry Dalton, the appellee in this case?

*A.* I do.

4. *Q.* How long have you known him?

*A.* I have known him since the latter part of 1844, or beginning of 1845.

5. *Q.* Do you know how long he has resided in California?

*A.* Yes; since the latter part of 1844 or beginning of 1845.

6. *Q.* Do you know the country of his birth?

*A.* He has frequently told me he was an Englishman.

7. *Q.* Do you recollect the last time he told you so?

*A.* Yes—in May, I think it was, in 1847; I was coming, in company with Mr. Dalton, from Azusa to Santanita; he told me that he was an Englishman; that he never was a Mexican citizen, and never intended to be an American citizen.

J. S. Mallard:

My name is J. S. Mallard; residence, San Gabriel; my age is 39, and a merchant by occupation; I have resided in California five years, and in Los Angeles county the same length of time, with the exception of four months I know Henry Dalton, and have known him since January, 1850, as a resident of Los Angeles city.

*Question.* Do you know the rancho of San Francisquito?

*Answer.* I don't know that I do, only from report.

*Q.* Do you know the country of Mr. Dalton's birth?

*A.* I do not.

*Q.* Do you know whether or not Mr. Dalton, the appellee in this case, is a native of Mexico? And if not, state generally how you know the fact.

*A.* Some time in the year 1853, I heard Mr. Dalton say that he claimed not to be a citizen of the United States, nor of Mexico. I know it was in a court of justice, and think he was called as a juror; (the court reserved their decision.) I think he was under oath, but am not certain. I think it was in the Court of Sessions, whilst I was sitting as an associate justice; but I am not certain if it was in that court, or in a justice's court, whilst I was a judge of both courts. I think he was excused on that ground.

*Q.* Did you ever hear Mr. Dalton say, on any other occasion, that he was not a naturalized citizen of Mexico?

*A.* I do not recollect that I ever did.

### Cross-examined by Claimant's Counsel.

*Question.* Did he say anything more than that he claimed not to be a citizen?

*Answer.* My answer is, that he did. My recollection is, that he stated, that while in Mexico, he had either applied to become a citizen, or had some papers made out; and that, from some reason, which I do not recollect, the business of his naturalization was not completed.

*Q.* Did he not say this, that the papers had been made out in Mazatlan, but that they had not reached him?

*A.* It might have been so; but my recollection was, that the action on his application had not been completed, and that, for that reason, he (Dalton) said he did not consider himself a Mexican citizen.

It was argued in this court by *Mr. Brent* for the appellant, and by *Mr. Black* (Attorney General) for the United States.

The arguments upon the point whether or not Dalton, if a foreigner, could hold lands in California, are omitted. Upon the question of the evidence bearing upon this fact, *Mr. Brent* remarked as follows:

II. It is submitted that there is no sufficient evidence in the record to show that he was an alien to Mexico.

All the evidence in the record upon the subject of alienage is in the deposition of J. S. Mallard, and answers in the deposition of Sexton.

The substance of the deposition of Mallard, on the point of alienage, is simply this—that the appellant, with the object of avoiding jury service, made loose declarations that he did not claim or consider himself to have been a citizen of Mexico. The witness, Mallard, nowhere says that Dalton admitted that he was born in England, but only that he did not claim to be an American or Mexican citizen. He may very well have been

a Mexican citizen, and not have *claimed* to be one; but would that destroy his citizenship? The testimony of the other witness, Sexton, shows that, in 1847, Dalton declared he was not a Mexican citizen, and that he never intended to be an American citizen. The court will recollect that, in 1847, we were at war with Mexico—that our forces were overrunning California in every direction, and that, even supposing Mr. Dalton to have been a naturalized-Mexican citizen, it may not have been suitable for his interest to avow that fact, in the midst of the clamor of the war; or there may have existed a hundred motives why he would not have proclaimed the fact to the American, Sexton.

None of these declarations of Dalton are in a positive form. They were made to third parties, under circumstances not affecting this litigation, and they are not sufficient to rebut the presumptions that he was a Mexican citizen. If the court deem that a material presumption to sustain this grant against these loose declarations of his, we have the positive patent of the Mexican authorities, not issued improvidently by the Governor, but after near two months' consideration, and after due report from the municipal authorities that there was no impropriety in the grant. It seems to be a conclusive presumption from a genuine grant, that the grantee was naturalized, or otherwise competent to take.

3 Pick., 224.

United States *v.* Reading, 18 How., 8, 9.

The Attorney General contended that the alienage of Dalton was clearly and satisfactorily proved.

Mr. Justice GRIER delivered the opinion of the court.

The title of Dalton is found in the archives, and its authenticity is not disputed. The expediente exhibits:

1st. A petition of Henry Dalton, dated March 12th, 1845, at Los Angeles, setting forth that he is a resident of that city; that he is endeavoring to increase the number of cattle on the premises which he possessed, called Azusa, but that he lacked more land for that purpose; that the mission of San Gabriel

owned a large plain adjoining his tract of Azusa, which was useless to them. It was accompanied with a diseno or map of the land. The quantity desired was two sitios.

On the 13th of March, Pio Pico, acting Governor, makes the usual marginal order for information, referring the petition to Father Thomas Estinega, minister to the mission of San Gabriel, to report.

March 26th. Estinega reports, that the tract solicited is one of those which the mission cannot cultivate, because it is deficient in water; and considering that Dalton offers to deliver him, as a gift for the Indians, five hundred dollars, he consents that a grant of the land be made to Dalton.

This petition was referred also to the municipal counsel of Los Angeles, who reported in favor of the grant, and on the 14th of April certified their approval to the Governor.

On the 26th of May, 1845, Governor Pico orders a grant to be made out for two sitios, and sent to the Departmental Assembly for their approval.

June 9th, 1845. The Departmental Assembly, upon report of the committee on waste lands, to whom the expediente had been referred, approve the grant as in conformity with the law of August 18th, 1824, and the regulations of 21st of November, 1828.

In pursuance of this grant, judicial possession was delivered to Dalton, February 14, 1846, in due form, with a regular survey of the boundaries.

The only objection urged in this court to this title, as justifying its rejection, is, that Henry Dalton was a foreigner, and had not been naturalized, and was therefore incapable of taking a grant of land.

The counsel for the plaintiff in error deny both the law and the fact as assumed in this objection.

1st. They contend that it was no part of the policy of the Spanish or Mexican Government to exclude foreigners from holding lands; that the colonization law of 1824 invites foreigners to "come and establish themselves within the Mexican territory, and gives them privileges against taxation," &c., &c.; and provides that, until after 1840, the General Congress

shall not prohibit any foreigner as a colonist, unless imperious circumstances should require it with respect to *individuals of a particular nation.*

2d. They contend, also, that the regulations of 1828 require the Governor to obtain the necessary information as to whether the petitioner is a person within the conditions required to receive a grant; that the expediente found in the record shows a full compliance with the law; that the definitive title, which is a valid patent, recites that the petitioner was "in the actual possession, by *just title*, of a rancho" known by the name of Azusa; that this is a legislative adjudication of the fact of the grantee's capacity to hold land, and per se a naturalization, if he had previously been an alien; that, at least, it affords a prima facie if not a conclusive presumption of the grantee's capacity to receive a further grant of lands.

3d. They contend, also, that any legislation repugnant to this policy of the Government of Mexico since that time originated in, perhaps, a just jealousy of their American neighbors, and was aimed wholly at them, and intended to apply only to the colonies bounding on the United States; that this is apparent from the edict of Santa Anna of 1842, which permits foreigners not citizens, residing in the Republic, to acquire and hold lands, and excepts only the Departments "*upon the frontier and bordering upon other nations;*" that California was never treated as within this category, as the colonized and settled portion of it is separated a thousand miles from the frontier or border of any nation, and was at that time almost a *terra incognita* to the rest of the world.

4th. They contend that, by the Spanish as well as by the common law, a foreigner is not incapable of taking a grant of land, but holds it subject to be denounced in the one case, and forfeited by an inquest of escheat in the other; that the grant in this case being complete, neither the United States land commissioners, nor the courts authorized to adjudicate the Mexican title under the treaty, can exercise the functions either of denouncers or escheators.

5th and lastly. It is contended, that even if the court considered itself bound to declare this grant void by reason

of the alleged incapacity of the grantee to take or hold, yet that there is no sufficient evidence to establish the fact of alienage against the strong presumption of the contrary, arising from the face of the expediente and definitive title.

The court do not intend to express any opinion upon the first four of these propositions, as the last suggests a sufficient reason for the confirmation of this grant.

In all cases, the testimony of admissions or loose conversations should be cautiously received, if received at all. They are incapable of contradiction. They are seldom anything more than the vague impressions of a witness of what he thinks he has heard another say—stated in his own language, without the qualifications or restrictions, the tone, manner, or circumstances, which attended their original expression. If a complete record title with ten years' possession could be divested by such testimony, its tenure would be very precarious, especially where the owner is surrounded by a population of settlers interested in defeating it. All the evidence on the record on the subject of alienage, besides that of a brother who proved *himself* an alien, is in the deposition of two witnesses. One states that Dalton, in *order to avoid serving as a juryman*, said "he did not claim to be an American or Mexican citizen." He might well have been a citizen, although he was not desirous of setting up such a claim on that occasion. The other states that in 1847, during the war, when the country was occupied by the American forces, he said "he was not a Mexican, and never intended to become an American citizen." At such a time, he may have had many motives prompting him to make such a representation. The Mexican Government had ceased to protect him, and the treaty of Guadalupe Hidalgo had not then made him an American citizen.

Now, assuming that these witnesses have remembered and reported the precise words used by the claimant in these loose conversations, they contain no positive assertion that he had never been naturalized, or was born out of Mexico. Such testimony ought not to be received to outweigh the prima facie (if not conclusive) presumptions arising from the expediente and definitive title.

In this respect, this case closely resembles the case of United States *v.* Reading. (18 How., 1.)

The decree of the District Court is reversed, and the title of the claimant to the land in question is hereby confirmed.