.AMERICAN NAT. BANK *et al.* v. E. W. ADAMS & CO.

No. ˙3789.   Opinion Filed September 22, 1914.

Rehearing Denied October 20, 1914.

(143 Pac. 508.)

1.    **BANKS AND BANKING—Cashier—Authority to Bind Bank.** A national bank is not bound by the acts of its cashier, when such cashier has acted beyond the scope of his authority as such officer.

2.    **SAME—Receipt of Deposits—Authority of Cashier.** A national bank may receive special deposits, such as notes, stocks, bonds, securities, bills of exchange, etc., the handling of which in their very nature comes within the regular line of banking business, and the acts of the cashier in receiving such deposits are binding on the bank.

3.    **SAME—Banking Business—What Constitutes—"Special Deposit."** Allowing a stock of shoes in which a bank has no interest to be stored in the back end of the bank is not a transaction coming within the general line of banking business, and is not within the general scope and meaning of the term "special deposit."

4.    **SAME—Bailment—Cashier—Liability on Guaranty.** Where a cashier agrees with two contracting parties that a stock of

shoes may be stored in the back. end of a bank, and guarantees to such parties that same will be delivered to the proper party upon compliance with certain stipulations entered into between the parties, upon his failure to deliver such goods according to such guaranty, the bank will not be bound by the cashier's contract of guaranty, but the cashier may be held personally liable as bailee for a breach of his guaranty.

(Syllabus by Harrison, C.)

*Error from County Court, Atoka County;*

*Baxter Taylor, Judge.*

Action by E. W. Adams & Co. against the American National Bank and another for possession of a stock of shoes. Judgment for plaintiff, and defendants bring error. Modified and affirmed.

*W. S. Farmer,* for plaintiffs in error.

*Linebaugh Bros. & Pinson,* for defendant in error.

Opinion by HARRISON, C. This action was instituted by E. W. Adams & Co. against the American National Bank and F. E. Adams, the cashier, for possession of a stock of shoes of the alleged value of $493.49. E. W. Adams & Co. had at some time previous thereto been in the mercantile business in Kansas. They left Kansas and opened up a store in Oklahoma. Soon thereafter the stock of shoes in question was attached by the Elliot-Kendall Shoe Company, the shoes being of the Elliot-Kendall brand and having been purchased from such company by Adams & Co. When the order of attachment was served, Adams & Co. and the Elliot-Kendall Shoe Company, and their attorneys, entered into a stipulation wherein it was agreed that the stock of shoes should be stored in the back end of the American National Bank, to be turned over to the Elliot-Kendall Shoe Company on or before a certain date, provided such Shoe Company delivered to E. W. Adams & Co. a warranty deed to certain lots or tracts of land situated in Hamilton county, Kan.; but, in the event such deed was not furnished within the time specified, then the stock of shoes should be turned back to E. W. Adams & Co. The bank, through its cashier, F. E. Adams, accepted an indemnity

bond from the Elliot-Kendall Shoe Company, and agreed to permit the stock of shoes to be stored in the back end of the bank, and guaranteed that delivery of same should be made to the party entitled thereto according to the terms in the stipulation signed by the Elliot-Kendall Shoe Company and by E. W. Adams & Co. A deed to the land in question was received through the mail by the American National Bank in due time, and the parties and their attorneys notified of the receipt of same, pursuant to which notice E. W. Adams & Co. and the attorney for the Elliot-Kendall Shoe Company appeared at the bank, examined the deed, and held a conference as to what should be done in the premises in reference to the acceptance of the deed by Adams & Co. and the turning over of the stock of shoes to the Elliot-Kendall Company.

It is claimed by the bank, and so testified to by the cashier, Adams, and some of the other bank employees, that the deed was turned over to Adams & Co. and was accepted by it and retained possession of by such company. On the other hand, it is claimed by Adams & Co. that such deed was unsatisfactory and not according to the stipulations, being a quitclaim instead of a warranty deed, and was not accepted, but was left in the bank. Pursuant to such conference, however, the stock of shoes was turned over to J. M. Humphreys, attorney for the Elliot-Kendall Shoe Company. Subsequently E. W. Adams & Co., claiming to have rejected the deed on the ground that it was not according to stipulations, and on the ground that they had left same with said bank, or the cashier thereof, demanded return of the stock of shoes. This being refused, suit was brought against the bank and F. E. Adams, the cashier, for possession of the shoes, or the value thereof. The cause was tried, resulting in a verdict and judgment in favor of E. W. Adams & Co. for the return of the stock of shoes, or the value thereof, and from such judgment the bank and F. E. Adams appeal to this court for review.

A number of assignments are urged for reversal, the decisive one being that the guaranty that the stock of shoes would be turned over to the proper party according to the stipulation between the parties was signed by the cashier of the bank; that such

a contract of guaranty was out of the line of the bank's regular business under its charter, and outside of the line of authority of the cashier, and therefore *ultra vires,* and not binding on the bank.

A great number of authorities are cited by plaintiffs in error in support of the contention that a corporation cannot be bound by acts of its officers outside of their scope of authority. The authorities cited seem to be well in point and to overwhelmingly support this contention. We have examined them, but find that none of them pass on the exact question whether the bank, in accepting the stock of shoes as a special deposit under the circumstances of this case, was exceeding the powers contemplated in the national banking act, or whether it was acting within the margin allowed to a national bank under the provisions of its charter and the provisions of the national banking act in carrying on its regular business.

On the other hand, it is contended by defendant in error that this was in the nature of a special deposit, and as such came within the line of the bank's regular business, at least, within the scope allowed banks in carrying on their regular business, and, being a special deposit in line with the bank's regular business, its cashier had authority to accept such as a special deposit, and that the bank was bound by his acts. The rule that a bank is bound by the acts of its cashier in accepting deposits which come within the scope and meaning of the term "special deposits," has become so well settled as to admit of but little question. See *Case v. Bank,* 100 U. S. 446, 25 L. Ed. 695 ; 4 Thompson on Cor., section 4765. But the exact question in the case at bar is whether an agreement that a stock of goods should be stored in the back end of a bank building is such a transaction as comes within the general scope and meaning of the term "special deposits." A number of very strong and able decisions are cited by defendant in error in support of the contention that this was a special deposit. But from an examination of the authorities cited, and of many others touching upon the question, we find that in each case the courts were dealing with, and had in contemplation, such deposits

as notes, stocks, bonds, securities, etc., the handling of which, in their very nature, comes, at least partially, within the regular line of banking business.   One of the strongest cases cited is the case of *First National Bank v. Graham,* 100 U. S. 699, 25 L. Ed. 750, in which the court said:

"The forty-sixth section of the banking act of 1864," which authorizes "a national bank  *  *  *  to deliver special deposits,  *  *  *  implies clearly that a national bank, as a part of its legitimate business, may receive such special deposits."

"Conceding for the moment that the contract was illegal and void, for the reason alleged in behalf of the bank, the consequence insisted upon would by no means follow.   There was no moral turpitude on either side—certainly none on the part of the depositor.   She was entitled, at any time, to reclaim the securities. The bank was bound in good faith and in law to return them, or to keep them, without gross negligence, until they were called for."

This language might be taken to mean that, although the contract between the bank and the depositor was illegal, yet the bank would be held liable for negligence in the loss of the deposits. But here again it must be borne in mind that the question of whether the act of receiving the deposit was the act of the bank, or the mere act of the cashier, was not involved in the case at bar, and the court had in mind such special deposits as ordinarily come within the course of the banking business, and did not have in contemplation the character of transaction involved in the case at bar.   The court concludes its opinion as follows:

"It would, undoubtedly, be competent for a national bank to receive a special deposit of such securities as those here in question, either on a contract of hiring or without reward, and it would be liable for a greater or less degree of negligence accordingly.   We do not mean that it could convert itself into a pawnbroker's shop.   That subject involves topics alien to the case before us, and which in this opinion it is unnecessary to consider."

In the case at bar the stock of shoes was permitted to be stored in the back end of the bank, doubtless in an empty room

not used by the bank in the regular course of its banking business, and under the circumstances we view the transaction as more in line with the business of warehousemen receiving goods for storage than in line with transactions ordinarily carried on through banks. It is intimated in *Bank v. Graham, supra,* that "a bank could not convert itself into a pawnbroker's shop," and we believe the reason is equally strong for holding that it could not convert itself into a cold storage establishment or a company of warehousemen. We do not believe the transaction in question comes within the scope of banking business, nor that the cashier had authority to bind the bank by his acts in such transaction. It is apparent from the record, however, that the defendant in error entered into this agreement in good faith. As stated in the body of the opinion in *Bank v. Graham, supra:*

"There was no moral turpitude on either side, and certainly none on the part of the depositor."

In the case at bar, E. W. Adams & Co. in good faith contracted with Elliot-Kendall Shoe Company that, upon receipt of a warranty deed to the certain tracts of land in Kansas, the stock of shoes should be turned over to such Shoe Company, and, in the event such warranty deed was not executed to them, that they should receive the stock of goods themselves, and both parties agreed with the cashier of the bank, in good faith, that the cashier would see that the terms of the contract were faithfully carried out. It appears from the record that, instead of the warranty deed as contracted for, a kind of release and quitclaim deed was sent to the bank, and that such instrument was not accepted by E. W. Adams & Co. It is true that there was a conflict in testimony as to whether Adams & Co. accepted the deed, or whether they refused it and left it in the bank; but this was merely an issue of fact, which was submitted to the jury and found in favor of E. W. Adams & Co., and we do not feel authorized to disturb the jury's finding in this regard. Hence, in view of the fact that a warranty deed was contracted for, that a quitclaim deed was sent

instead, and in view of the jury's finding that such quitclaim deed was not accepted by E. W. Adams & Co., and the further fact that said E. W. Adams & Co. entered into the agreement in good faith with F. E. Adams, the cashier of the bank, as a voluntary bailee, to see that the stock of shoes was delivered according stipulation between the parties, and in view of the further fact that the said cashier upon his own authority turned such stock over to the Elliot-Kendall Shoe Company, we believe that said cashier, F. E. Adams, should be held personally liable to E. W. Adams & Co. for the return of the shoes, or the value thereof.

The judgment of the trial court should, therefore, be modified, so as to render F. E. Adams liable for the return of the stock of shoes in question, or the value thereof.

By the Court: It is so ordered.