[No. 13702.   Department One.   May 11, 1917.]

ANNIE MYERS, *Appellant*, v. EXCHANGE NATIONAL

BANK, *Respondent*.[1]

COURTS—FEDERAL QUESTION—NATIONAL BANK ACT.  The interpretation of the national bank act presents a Federal question.

BANKS—NATIONAL BANKS—POWERS—LIABILITY IMPOSED BY STATE LAWS.  The national bank act constitutes the measure of authority of national banks, which have only such powers as are specifically granted or are incidental to carrying on the business of banking; and the state cannot impose any liability by adding any powers to those granted or fairly implied in the Federal act.

BANKS—NATIONAL BANKS—SPECIAL DEPOSITS—RECEIPT OF WILLS FOR SAFE-KEEPING.  5 Fed. Stat. Ann. § 5136, subd. 7, of the national bank act, authorizing national banks to carry on "the business of banking  .  .  .  by receiving deposits  .  .  ." etc., and § 5228, authorizing them in certain contingencies, "to deliver special deposits" must be construed together, and mean that the deposits must be such as are fairly embraced within the "business of banking."

SAME.  The receipt of a will for safe-keeping by a national bank is not the receiving of "a special deposit" fairly embraced within the meaning of the national bank act which impliedly authorizes national banks to receive special deposits.

CUSTOMS AND USAGES—VIOLATION OF LAW.  No rights can spring from the custom of national banks to receive wills for safe-keeping in violation of the powers granted by the national bank act.

WILLS—CUSTODY—LIABILITY FOR FAILURE TO DELIVER—NATIONAL BANKS.  A letter from a national bank acknowledging receipt of a will sent for safe-keeping and delivery upon the death of the sender, stating that the will had been filed for safe-keeping, and the failure of the bank to deliver the will according to directions, creates no liability *ex contractu* or *ex delicto*.

LIMITATION OF ACTIONS—ACTION ON PENALTY—WILLS—CUSTODY—FAILURE TO DELIVER—STATUTES.  A right of action under Rem. Code, §§ 1289 and 1292, for damages against any person having custody of a will, for failure to deliver the will for probate within thirty days after the death of the testator, is an action upon the statute for a penalty, under Id., § 159, subd. 6, which must be commenced within

[1]Reported in 164 Pac. 951.

three years after the cause of action arose; and is too late if not commenced until more than three years after the last act in the administration of the testator's estate was performed.

Appeal from a judgment of the superior court for Spokane county, Sullivan, J., entered August 5, 1916, upon sustaining a demurrer to the complaint, dismissing an action for damages, tried to the court. Affirmed.

*Merritt, Lantry & Merritt,* for appellant.

*Cullen, Lee & Matthews* and *Post, Russell, Carey & Higgins,* for respondent.

WEBSTER, J.—This is an action for damages. A demurrer to the amended complaint having been sustained and the plaintiff declining to plead further, a judgment was entered dismissing the action. The plaintiff has appealed.

The essential allegations in the complaint are, that the respondent is, and at all times hereafter stated was, a national bank doing business in the city of Spokane; that it has from the beginning been the custom of all banks, including the respondent, to receive and accept wills for safe-keeping, to be delivered as directed upon the death of a testator; that Enos S. Perdue, under the name of William Perdue, was for a number of years a resident of the city of Spokane, a customer of the respondent, one of its stockholders, and was well known to its officers; that, in April, 1909, Perdue mailed, from the city of Los Angeles, in the state of California, his last will and testament to the respondent for safe-keeping, in a sealed envelope, with a letter requesting it to hold the will subject to his order during his lifetime and, upon "satisfactory proof" of his death, to deliver it to either his friend Michael D. Shea, of Spokane, or a brother, William Perdue, of Glenmont, Ohio, and that respondent acknowledged receipt of the letter and sealed envelope, saying that the envelope had been filed for safe-keeping. It is further alleged that Shea was well known to the officers of the bank, was a resident of Spokane, and kept a place of business therein; that Perdue died

in February, 1911, in the state of Ohio; that, believing Perdue died intestate, Shea, at the instance of the heirs of Perdue, was appointed administrator of his estate; that the estate was settled and distributed to the father and mother of Perdue, they being his sole heirs at law; that none of the beneficiaries under the will knew that the will existed until its delivery to Shea in October, 1914; that the respondent, through its president and other officers, had notice and knowledge of the death of Perdue pending the administration of the estate; that the appellant, under the terms of the will, would have received in excess of $4,000 had the will been produced; that the respondent retained the will in its possession until October, 1914, when it delivered it to Shea inclosed in the sealed envelope; that the estate of Perdue had then been administered and closed and the property dissipated or lost, and that, up to that date, the respondent "concealed the existence" of the will from the appellant, the other beneficiaries named in the will, and from Shea and the brother, William Perdue.

The respondent demurred to the complaint upon two grounds: (1) that it does not state facts sufficient to constitute a cause of action; and (2) that the action had not been commenced within the time limited by law.

The appellant, if we correctly interpret the brief, relies (a) upon the contract evidenced by the two letters, and (b) upon the statute of this state. The sections of the statute relied upon are 1289 and 1292, Rem. Code, which provide that any person having the custody of a will shall, within thirty days after he shall have received knowledge of the death of the testator or testatrix, deliver the will into the superior court having jurisdiction or to the person named in the will as executor, and that any person "who shall wilfully fail or neglect" to so deliver a will shall be liable to every person interested in the will for damages by such neglect.

The respondent is a national bank, and the solution of these questions necessitates an interpretation of the national bank act and a review of the decisions of the Federal courts. This

obviously presents a Federal question. The applicable provisions of this act are found in Federal Statutes Annotated, Vol. 5, §§ 5133, 5136, 5169, 5211, and 5228.

Section 5133 provides that, "Associations for carrying on the business of *banking* [italics ours] under this title may be formed by any number of natural persons, not less in any case than five."

Section 5136, subd. 7, provides that every association shall have power:

"To exercise by its board of directors, or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of *banking;* by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes according to the provisions of this title."

Section 5211 provides that every association shall make to the comptroller of the currency "not less than five reports" during each year; "each such report shall exhibit, in detail and under appropriate heads, the resources and liabilities of the association at the close of business on any past day by him specified." Section 5228 provides that, in the contingencies there stated, which are not material here, it shall be lawful for the association "to deliver special deposits."

The act authorizing the creation of a Bank of the United States received its first interpretation by the Federal supreme court in the case of *McCulloch v. Maryland,* 4 Wheat. 316. The question there presented was whether a state could tax a branch of the Bank of the United States. In deciding that a state has no such power, the court said, at page 435:

"The court has bestowed on this subject its most deliberate consideration. The result is a conviction that the states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government. This is, we think, the un-

avoidable consequence of that supremacy which the constitution has declared. We are unanimously of opinion, that the law passed by the legislature of Maryland, imposing a tax on the Bank of the United States, is unconstitutional and void."

It has been held that the same rule applies to national banks. *Farmers' & Mechanics' Nat. Bank v. Dearing*, 91 U. S. 29. The reason assigned is:

"The national banks are instruments designed to be used to aid the government in the administration of an important branch of the public service."

In *Easton v. Iowa*, 188 U. S. 220, the president of a national bank was convicted and sentenced, under the provisions of a statute of the state of Iowa, for receiving a deposit at a time when he knew the bank was insolvent. In reversing the case, the court said that the Federal law creating and regulating national banks "has in view the erection of a system extending throughout the country, and independent, so far as powers conferred are concerned, of state legislation, which, if permitted to be applicable, might impose limitations and restrictions as various and as numerous as the states."

In *McCormick v. Market Bank*, 165 U. S. 538, it was decided that a national bank in process of organization, but which had not been authorized by the comptroller of the currency to commence the business of banking, was not liable for a breach of a five-year lease which it had executed with a view to obtaining certain offices to be used and occupied by it for banking purposes. This view was based on the provisions of the Federal statute to the effect that no such association shall transact any business "except such as is incidental and necessarily preliminary to its organization," until it has been authorized by the comptroller to commence the business of banking. In the course of the opinion, the court said:

". . . The lease is void, cannot be made good by estoppel, and will not support an action to recover anything beyond the value of what the defendant has actually received and enjoyed."

In *California Bank v. Kennedy*, 167 U. S. 362, the action was brought to recover a judgment against a national bank which had sought to subscribe for stock in a savings bank. Both banks had become insolvent. The action was based upon a statute of the state of California, on the theory that the national bank was a stockholder in the savings bank and, in consequence, liable under the laws of the state to pay the debts of the savings bank in proportion to the amount of stock held and owned by it. The bank had received a dividend from the state bank before the latter became insolvent. The record presented two questions:

"1st, do the statutes of the United States, Rev. Stat., § 5136 *et seq.*, relating to the organization and powers of national banks, prohibit them from purchasing or subscribing to the stock of another corporation."

"(2)   The transfer of the stock in question to the bank being unauthorized by law, does the fact that, under some circumstances, the bank might have legally acquired stock in the corporation estop the bank from setting up the illegality of the transaction?"

Both questions were resolved in favor of the immunity of the national bank. In deciding the first question, the court said:

"As to the first question.—It is settled that the United States statutes relative to national banks constitute the measure of the authority of such corporations, and that they cannot rightfully exercise any powers except those expressly granted, or which are incidental to carrying on the business for which they are established. *Logan County Bank v. Townsend*, 139 U. S. 67, 73. No express power to acquire the stock of another corporation is conferred upon a national bank, but it has been held that, as incidental to the power to loan money on personal security, a bank may in the usual course of doing such business accept stock of another corporation as collateral, and by the enforcement of its rights as pledgee it may become the owner of the collateral and be subject to liability as other stockholders. *National Bank v. Case*, 99 U. S. 628. So, also, a national bank may be conceded to possess the incidental power of accepting in good

faith stock of another corporation as security for a previous indebtedness. It is clear, however, that a national bank does not possess the power to deal in stocks. The prohibition is implied from the failure to grant the power."

Addressing itself to the second question, it was said:

"Whatever divergence of opinion may arise on this question from conflicting adjudications in some of the state courts, in this court it is settled in favor of the right of the corporation to plead its want of power, that is to say, to assert the nullity of an act which is an *ultra vires* act. . . . 'A contract of a corporation, which is *ultra vires*, in the proper sense, that is to say, outside the object of its creation as defined in the law of its organization, and therefore beyond the powers conferred upon it by the legislature, is not voidable only, but wholly void, and of no legal effect. The objection to the contract is, not merely that the corporation ought not to have made it, but that it could not make it. The contract cannot be ratified by either party, because it could not have been authorized by either. No performance on either side can give the unlawful contract any validity, or be the foundation of any right of action upon it.' . . . As said in *McCormick v. Market National Bank*, 165 U. S. 538, 549: 'The doctrine of *ultra vires*, by which a contract made by a corporation beyond the scope of its corporate powers is unlawful and void and will not support an action, rests, as this court has often recognized and affirmed, upon three distinct grounds: The obligation of any one contracting with a corporation to take notice of the legal limits of its powers; the interest of the stockholders not to be subject to risks which they have never undertaken; and, above all, the interest of the public that the corporation shall not transcend the powers conferred upon it by law. . . .' Applying the principles of law thus settled to the case at bar, the result is free from doubt. The power to purchase or deal in stock of another corporation, as we have said, is not expressly conferred upon national banks, nor is it an act which may be exercised as incidental to the powers expressly conferred. A dealing in stocks is consequently an *ultra vires* act. Being such, it is without efficacy. *Pearce v. Railroad Company*, 22 How. 441, 445. Stock so acquired creates no liability to the creditors of the corporation whose stock was attempted to be trans-

ferred. (Cook on Stocks and Stockholders, vol. 1, p. 435, note 1 to sec. 316, and authorities there cited.)"

It was further held that the bank was not estopped from questioning its ownership of stock and consequent liability because of its receipt of dividends on the stock of the savings bank.

The same principles were announced in *Concord First Nat. Bank v. Hawkins*, 174 U. S. 364, where a receiver of an insolvent national bank sought to enforce a stockholder's liability against another national bank which, prior to its insolvency, had purchased of a third party, with a portion of its surplus funds, a number of shares of stock of the insolvent bank as an investment. In meeting an argument that the liability was not contractual but statutory, the court said:

"In the present case it is sought to escape the force of these decisions by the contention that the liability of the stockholder in a national bank to respond to an assessment in case of insolvency is not contractual, but statutory. Undoubtedly, the obligation is declared by the statute to attach to the ownership of the stock, and in that sense may be said to be statutory. But as the ownership of the stock, in most cases, arises from the voluntary act of the stockholder, he must be regarded as having agreed or contracted to be subject to the obligation. However, whether, in the case of persons *sui juris*, this liability is to be regarded as a contractual incident to the ownership of the stock, or as a statutory obligation, does not seem to present a practical question in the present case."

*Merchants' Nat. Bank of Cincinnati v. Wehrmann*, 202 U. S. 295, had its origin in a bill for the dissolution of a partnership, a receiver, and an account. The partnership was formed to purchase, improve, divide into lots, and sell a leasehold. The Merchants National Bank took nine shares as security for a debt, and afterwards became the owner of them in satisfaction of the debt. It developed that a contribution was required to pay the debts of the firm. Some of the parties being insolvent, the bank was charged with the full share of

an insolvent partner.   Differentiating between a corporation and a partnership, the court said:

"But when a similar transfer is made of a share in a partnership it means that the transferee at once becomes a member of the firm and goes into its business with an unlimited personal liability, in short, does precisely what a national bank has no authority to do. . . . As the bank was not estopped by its dealings to deny that it was a partner, it was not estopped to deny all liability for partnership debts."

In *First Nat. Bank of Ottawa v. Converse*, 200 U. S. 425, it was decided that a national bank cannot take stock in a new speculative corporation with the common double liability in satisfaction of a debt.   In *Farmers' & Merchants' Nat. Bank v. Smith*, 77 Fed. 129, it was held that the bank was not liable upon its guaranty of a mortgage bond which it had sold on commission as a broker, because the brokerage business was not within the legitimate sphere of banking.   In *Bowen v. Needles Nat. Bank*, 94 Fed. 925, it was held that the bank was not liable on its engagement to pay debts of a third person when such person had no funds on deposit, a fact known to both the plaintiff and the bank.   The case was complicated by the fact that the plaintiff relied upon the guaranty and cashed the checks on the faith thereof.   The court said there was, in the Federal act authorizing the creation of national banks, "no grant of power to guarantee the debt of another, nor can such guaranty be said to be incidental to the business of banking."   It is important to bear in mind that neither of these cases presented the question of a guaranty upon an indorsement of commercial paper taken in the ordinary course of banking and rediscounted.

*Commercial Nat. Bank v. Pirie*, 82 Fed. 799, voices the same principle.   In *Cooper v. Hill*, 94 Fed. 582, it was held that a national bank which has lawfully acquired a mining property has implied authority to pump the water out of the shafts and drifts to put it in a condition in which it could be examined by a purchaser, but that it has no authority, when

no purchaser was found, to expend money in prospecting for paying ore upon the property in which none had ever been discovered. In *Hotchkin v. Third Nat. Bank of Syracuse*, 219 Mass. 234, 106 N. E. 974, it was held that the bank was not liable in damages for the breach of an executory contract to sell and deliver shares of the capital stock in another corporation, which it did not have but which belonged to a client whom it sought to represent. The court distinguished between stock acquired by a national bank in payment or in satisfaction of a loan and the buying and selling of stocks as a source of revenue or profit.

In support of the theory that the will was a special deposit within the meaning of the national bank act, § 5228, *supra*, the appellant has cited *National Bank v. Graham*, 100 U. S. 699. In that case a national bank received for safekeeping certain government bonds, which the jury found were lost by the gross negligence of the bank or its officers, and returned a verdict for the depositor for the value of the bonds. It was held that the national bank act, § 5228, *supra*, authorized national banks to deliver "special deposits," implying clearly that a national bank, as a part of its legitimate business, may receive such "special deposits" and that the phrase "special deposits" thus used embraces deposits such as that there in question.

Among other cases cited by the court to sustain its view is *Foster v. Essex Bank*, 17 Mass. 479, 9 Am. Dec. 168. In that case the special deposit was a cask containing gold. Quoting from *Pattison v. Syracuse Nat. Bank*, 80 N. Y. 82, 36 Am. Rep. 582, it was said:

"A reference to the history of banking discloses that the chief, and in some cases the only, deposits received by the early banks, were special deposits of money, bullion, plate, etc., for safe-keeping, to be specifically returned to the depositor; that such was the character of the business done by the Bank of Venice (the earliest bank) and the old Bank of Amsterdam, and that the same business was done by the

Goldsmiths of London and the Bank of England, and we know of none of the earlier banks where it was not done."

In *American Nat. Bank v. Adams & Co.*, 44 Okl. 129, 143 Pac. 508, L. R. A. 1915B 542, it was held that a stock of shoes was not a special deposit within the meaning of the national bank act. In that case the shoes were received by the bank as a special deposit and stored in a room under its control and adjoining its office.

There is a wide hiatus between a cask containing gold, coin, money, bullion and plate, and a stock of shoes. No case has been cited in which a Federal court has held anything to be a special deposit except something having an intrinsic value. In *National Bank v. Graham*, the court adverted to the fact that the cashier of the bank cut the coupons from the bonds and placed the proceeds to the credit of the depositor.

Sections 5136 and 5228 of the national bank act should be read and construed together. It must be kept in mind that national banks can only be incorporated to carry on the business of banking. Section 5136, subd. 7, defines the manner in which banking shall be carried on; that is, "by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes according to the provisions of this title." The words in this section "by receiving deposits," and the words "special deposits" in § 5228 mean substantially the same thing, viz., that the deposit must be such as is fairly embraced in the "business of banking." The meaning is made clear in *California Bank v. Kennedy, supra*, where it is said that the statute relative to national banks constitutes "the measure of the authority of such corporation," and that they cannot rightfully exercise any powers except those specifically granted or which are incidental to the carrying on of business for which they are established. The right to receive deposits is ex-

pressly granted. The right to receive special deposits is impliedly granted, but these special deposits must be incidental to the business of banking.

The purpose of the national bank act is twofold: First, the bank is an agency of the Federal government to aid it in carrying out its enumerated powers; second, the bank is designed to afford a safe means of doing business. The act confers large powers upon the comptroller of the currency in aid of the accomplishment of both of these ends. It provides many checks and balances. The bank is required to make frequent reports to the comptroller. Each report must exhibit in detail "the resources and liabilities" of the association. If a national bank may be permitted to hold a will for safe-keeping for one of its customers, it may do so for all. It is obvious that a large city bank might thus become the custodian of many hundreds of wills. If liable at all in consequence of such holding, there might arise many large obligations which would not appear in the report to the comptroller and of which he would have no knowledge, thus nullifying at least some of the safeguards of the statute.

It is alleged in the complaint that it has been the custom of the respondent to receive wills for safe-keeping. Language may be found in *National Bank v. Graham*, 100 U. S. 699, which would impose a liability upon the bank under this allegation, but we think this view is modified by the later opinions of the Federal supreme court which we have reviewed. The view of the later cases is that the power to receive such a deposit must be expressly granted or fairly implied. It is elementary that no rights can spring from a custom that violates a law. *Paul v. Seattle*, 40 Wash. 294, 82 Pac. 601.

Is the respondent liable under our statute? We have determined that there is no liability upon the respondent either *ex contractu* or *ex delicto* under the terms of the letters which passed between the respondent and Perdue. It is equally plain that, under the Federal decisions which we have reviewed, the state cannot impose any liability upon a national

bank by adding any powers to those expressly granted or fairly implied in the act authorizing its creation.

There is another reason why the appellant cannot recover under our statute. The decree of distribution in the administration of the Perdue estate was entered on the 23d day of July, 1912. This action was commenced in October, 1915, more than three years after the last act in the administration of the Perdue estate was performed. Then, if at all, the cause of action arose. An action upon the statute for a penalty must be commenced within three years from the date the cause of action arose. Rem. Code, § 159, subd. 6. The cause of action, if any, is under this section and not under subd. 4, "an action for relief upon the ground of fraud." This view is supported by the recent decisions of this court: *Thomas v. Richter*, 88 Wash. 451, 153 Pac. 333; *Golden Eagle Min. Co. v. Imperator-Quilp Co.*, 93 Wash. 692, 161 Pac. 848; *Cornell v. Edsen*, 78 Wash. 662, 139 Pac. 602, 51 L. R. A. (N. S.) 279.

It is argued by the respondent that the cause of action arose, if at all, at the time the property was appraised, in view of the fact that the respondent's president was one of the appraisers, and that this fact is relied upon by the appellant as showing the knowledge of the bank of the death of Perdue. We need not decide whether this date or the date of final settlement and distribution of the estate controls, as the statute operates as a bar in either case.

The judgment is affirmed.

ELLIS, C. J., MORRIS, and MAIN, JJ., concur.